# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4578 | **DATE** | 6/28/2004 |
| **CASE TITLE** | Felicia J. Gardner vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. The court affirms the Commissioner's final decision. The Commissioner's motion for summary judgment [24-1] is granted, and plaintiff's motion for summary judgment [30-1] is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 2<br>number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUN 2 9 2004<br>date docketed | 34 |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | AK<br>docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | courtroom deputy's initials | 6/28/2004<br>date mailed notice | |
| IS | | IS<br>mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

2004 JUN 28 PM 4:14

FILED

Document received in
central Clerk's Office

**FELICIA J. GARDNER,** )
)
Plaintiff, )  Case No. 02 C 4578
)
v. )  Magistrate Judge
)  Martin C. Ashman
**JO ANNE B. BARNHART,** )
Commissioner of Social Security, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Felicia J. Gardner, seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the

final decision of the Commissioner of the Social Security Administration that she was not

entitled to Disability Insurance Benefits. The parties have consented to have this Court conduct

any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C.

§ 636(c); Local R. 73.1(a). Presently before this Court are both Plaintiff's and Defendant's

motions for summary judgment. For the reasons set forth below, this Court grants Defendant's

motion and denies Plaintiff's motion.


### I.    Procedural History

On May 5, 1998, Plaintiff filed an application for Disability Insurance Benefits ("DIB"),

alleging disability due to low back pain as of March 9, 1996. (R. at 16.) Her initial application

for benefits was denied and, upon review, her reconsideration request was also denied. (R. at 16,

86, 94.) Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. at 97.)

ALJ Bonny Barezky conducted the hearing on October 19, 1999, where Plaintiff, who was represented by counsel, Dr. Robert Marquis, a psychiatrist, and Mary Jennings, a friend and caretaker of the claimant testified. (R. at 32-81.) After the hearing, Plaintiff underwent an additional consultative psychological examination. (R. at 278-81.) Dr. Marquis reviewed the report of the examination and offered additional comments regarding Plaintiff's condition. (R. at 287-89.) Plaintiff responded to the additional comments before the ALJ issued her decision. (R. at 290-91.) On March 31, 2000, the ALJ rendered an unfavorable decision finding that Plaintiff was not disabled because she could perform a significant number of jobs in the national economy. (R. at 16-31.) This decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. (R. at 6-7.) *See* 20 C.F.R. § 422.210(a). Plaintiff now seeks judicial review of that decision.

## II.    **Background Facts**

### A.    **Plaintiff's Background**

Plaintiff was born on January 15, 1966, and is currently thirty-eight years old. (R. at 108.) After high school, Plaintiff earned an associate's degree and subsequently completed approximately one more year of college. (R. at 40.) Plaintiff's work experiences include accountant, bookkeeper, supervisor and data entry clerk. (R. at 116.) Her most recent position was as a program manager for the Illinois Department of Children and Family Services. (Id.) While employed in this position, Plaintiff was involved in a car accident in which she was rear-ended by a drunk driver in March of 1996. (R. at 43, 159-60.) Plaintiff sustained injuries to her leg, knee, back, and left hand. (R. at 149-50.) She complains of constant persistent back

- 2 -

pain as a result of the accident. Since that time, Plaintiff has tried to work at a number of unskilled jobs, but testified that her back pain forced her to quit each job. (R. at 45-46.) The ALJ gave Plaintiff the benefit of the doubt and found that she has not engaged in substantial gainful activity since her alleged onset date.[1] (R. at 17.)

### B. Medical Evidence

After her accident, Plaintiff was treated at Holy Cross Hospital. (R. at 149-57.) X-rays of her spine were normal. (R. at 153-54.) She was diagnosed with cervical-lumbar strain and a sprain of her left ankle. (R. at 152.) Plaintiff subsequently sought treatment from the Beverly Chiropractic Clinic where she was diagnosed with posttraumatic strains of the cervical spine, shoulder, and low back. (R. at 161.) In April of 1996, Plaintiff consulted orthopedic surgeon Jordan Trafimow, M.D., at Midwest Orthopaedics. (R. at 175.) Dr. Trafimow found marked deconditioning of the erector spinae muscles. (R. at 176.) He recommended that Plaintiff start a vigorous program of back stretching exercises. (Id.) One month later the physician reported that Plaintiff had not improved and that she "must be willing to do more." (R. at 174.)

Plaintiff returned to Midwest Orthopaedics in April 1997. (R. at 173.) She reported pain in her whole back which had gotten progressively worse. (Id.) She denied numbness, tingling, or radiation of pain into either of her lower extremities. (Id.) She had normal deep tendon reflexes, voluntary weakness, and a negative straight leg test. (Id.) The physician noted that Plaintiff displayed "virtually all" of Waddell's signs of non-organic symptoms. (Id.) He also

--------------------------------------------

[1] An earnings report showed that Plaintiff earned $4,005.50 in 1997 and $6,739.75 in 1998. (R. at 111.)

noted that "even though the pain has been present for a year, she still has not sought medication treatment until now." (Id.) The diagnosis was functional low back pain. (Id.)

In July of 1998, Stanley Rabinowitz, M.D., performed a consultative examination of Plaintiff. (R. at 181-83.) Plaintiff's chief complaint was back pain, although she was able to stand, sit and walk for short periods of time, and only took over-the-counter Motrin for her pain. (R. at 181.) Dr. Rabinowitz noted that a MRI of her lower back had shown a "frozen disc," although it appears that he did not review the MRI himself. (Id.) The ranges of motion in Plaintiff's lumbar and cervical spine were limited by her complaints of pain. (R. at 182.) She was able to ambulate around the exam room without an assistive device, but had mild difficulty getting on and off the examining table and could not do heel and toe walking or squatting. (R. at 183.) The diagnosis was chronic lumbar myofascial pain syndrome. (Id.)

Plaintiff visited the Orthopedic and Occupational Rehabilitation Center of St. James Center in September of 1998. (R. at 269-73.) These records were submitted after the hearing in front of the ALJ. Plaintiff reported that she was suffering from low back pain and was taking Naprosyn and Flexeril. (R. at 269.) The physical therapist recommended physical therapy three times a week, massage, postural correction, and strengthening exercises. (R. at 270.)

In December 1998, Jerry Rodos, D.O., performed a consultative psychological examination of Plaintiff. (R. at 197-201.) She told him that her pain problems stemmed from the March 1996 accident in which she suffered a closed head injury and damage to her thumb as well as a back injury. (R. at 198.) She was taking non-prescription Motrin for her pain. (Id.) Plaintiff indicated that she took naps and watched television all day. (Id.) She reported feelings of helplessness, hopelessness, and sadness. (Id.) Plaintiff appeared to have difficulty with

motivation, concentrating, and making decisions. (Id.) She reported that she did not experience seizures, but did have some blackouts. (R. at 199.) Dr. Rodos concluded that Plaintiff had a pain disorder or chronic pain disorder and major depression with psychotic features - single episode. (R. at 200.) He noted that there was no evidence of her report of a closed head injury, and also found that the amount of back pain she reported seemed out of proportion to the findings of Dr. Rabinowitz. (Id.) He found that as Plaintiff presented herself, she was unable to interact with other people, remember reasonable tasks, handle more than one set of instructions at a time, and was not very adaptable. (Id.)

In January 1999, Erika B. Altman, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") and Mental Residual Functional Capacity Assessment. (R. at 202-14.) Dr. Altman determined that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, but did not indicate any evidence of limitation in any other category. (R. at 211.) She also noted that Plaintiff exhibited "questionable credibility" and might be "presenting herself as impaired for secondary gain." (R. at 213.)

In June 1999, Plaintiff was examined by Alan Long, Ph.D., a clinical psychologist. (R. at 242-44.) Plaintiff told Dr. Long that she sustained a head injury in the March 1996 car accident and that she was hospitalized for about two weeks. (R. at 242.) She reported that her back hurt her every day but she did not take prescription medication because she was uninsured. (R. at 242-43.) Plaintiff told the doctor that she was making $50,000 at the Department of Children and Family Services. (R. at 243.) Dr. Long concluded that Plaintiff could be described as angry and depressed. (Id.) However, she did not present any diagnosis on Axis 1 or 2 of the DSM-IV

- 5 -

mental disorders. (Id.) In fact, Dr. Long found that "[Plaintiff] is obviously seeking assistance and seems to endorse all items during the mental status exam and other administered tests that would lead to a conclusion that she is incapable of working." (R. at 244.) He found that she did not present a convincing case for depression or other mental illness. (Id.) In his opinion, Plaintiff would be capable of performing simple repetitive tasks under supervision. (Id.) Dr. Long recommended that Plaintiff undergo the Rorschach and Minnesota Multiphasic Personality Inventory (MMPI-II) tests. (Id.)

After the hearing, the ALJ ordered Plaintiff to undergo further testing with Dr. Long. (R. at 278-81.) The results of the MMPI-II were invalid and suggested malingering as well as a serious adjustment disorder. (R. at 278.) The results of the Rorschach test indicated no psychosis, but did suggest extreme impulsivity and extreme emotional dependency. (R. at 279.) Plaintiff exhibited a fair ability to remember and carry out complex job instructions but a good ability to understand, remember and carry out simple job instructions. (R. at 281.) Dr. Long's diagnosis was Factitious Disorder with Combined Psychological and Physical Signs and Symptoms. (R. at 280.) He noted that an Adjustment Disorder with Depressed Mood should be ruled out. (Id.) Dr. Long found that Plaintiff may be exaggerating the degree of psychological distress from which she is suffering. (R. at 281.) He also found that she does not clearly present as having a severe mental illness although an adjustment reaction with a combination of psychological and physical complications could not be ruled out. (Id.) Plaintiff appeared to be capable of managing her own funds and performing simple repetitive tasks under supervision. (Id.)

### C. Plaintiff's Testimony

At the hearing in front of the ALJ, Plaintiff testified that she lives alone in a small apartment with a shared kitchen. (R. at 38.) She does not cook, clean, or do other household chores. (R. at 38-39, 55.) She cannot lift even a gallon of milk. (R. at 50.) Her meals come from her friend Mary Jennings or the Salvation Army food pantry. Plaintiff does not work and only leaves her apartment when her friend Ms. Jennings encourages her to do so. (R. at 40.) She does not drive. (R. at 54.) Her days consist of watching TV, laying in bed, and napping. (R. at 54-55.) Plaintiff generally washes up at the sink and gets dressed only if Ms. Jennings comes over because the pain is so bad. (R. at 56, 57.) Other than Ms. Jennings, Plaintiff does not have any friends, although she used to be active socially. (R. at 52, 57-58.)

Plaintiff testified that she used a cane and occasionally a wheelchair to ambulate. (R. at 49.) She said that she can sit for maybe a couple of hours if she were able to sit at an angle, and could walk about one mile at a slow pace. (R. at 49, 60.) She could only stand for about five minutes or less unless she was holding onto her cane. (R. at 49.) Plaintiff testified that the last time she drove a car was when the accident occurred, and she has not driven since then. (R. at 74.)

Plaintiff testified that the last time she worked was 1996 and she earned approximately $30,000 a year. (R. at 43.) After the car accident in 1996 in which her back, legs, arms, thumb, and head were injured, Plaintiff stayed in the hospital for a few days. (R. at 44.) Later she went to a "back to work" center, but has been unable to hold down a job due to the pain in her back and legs even though she has tried several occupations. (R. at 45-46.) She would like to return to work someday. (R. at 51.)

Plaintiff testified that the pain in her back was indescribable. (R. at 46.) She said it was as if someone hit her real hard, a sharp pain that knocks her off her feet. (Id.) Plaintiff rated the pain in her pain in her back as a ten on a scale of one to ten, the pain in her leg as a ten, and the pain in her arm as an eight. (R. at 47-48.) She also said that the pain was "not that bad" if she was taking her medication which consisted of samples from her doctor. (Id. at 47.)

### D. Witness Testimony

At the hearing, Plaintiff's friend and caretaker Mary Jennings also testified. Ms. Jennings is a Certified Medical Assistant but does not appear to receive any compensation for assisting Plaintiff. (R. at 70.) She cleans, cooks, and otherwise aids Plaintiff. (Id.) Ms. Jennings testified that she can see that Plaintiff is in pain when she tries to move in certain positions, such as in the bathtub. (Id.) Plaintiff's mood is affected by the weather and how much pain she is in. (R. at 72.) In order to get her out of the house, Ms. Jennings has to "psych her up" first. (Id.)

### E. Medical Expert's Testimony

Dr. Robert Marquis, a psychiatrist, was present and testified at the hearing after reviewing the medical evidence. (R. at 62-69.) He noted that it was difficult to determine Plaintiff's impairments as the orthopedic and medical evidence that would support her complaints of ongoing severe pain was contradictory. (R. at 63.) Dr. Marquis suggested a possible diagnosis of psychogenic pain syndrome if there were no physiological mechanism that could explain her pain. (R. at 63-64.) If she did have the condition, she would have marked impairment in activities of daily living, a marked impairment of social function, and would have frequent

disruptions of persistence and pace in a work setting. (R. at 64.) Dr. Marquis reviewed Dr. Long's report, and noted that judging from Plaintiff's responses it was possible that she either had an organic brain syndrome (of which there was no evidence) or that she was trying to make things seem worse than they were. (Id.)

After the hearing Dr. Marquis reviewed and analyzed Dr. Long's report of his follow-up consultative psychological examination with Plaintiff. (R. at 287-89.) He noted that the new evidence did not help a great deal in clarifying either the category of Plaintiff's impairment or its severity. (R. at 287.) Dr. Marquis noted that the results of Plaintiff's MMPI-II test were invalid and suggestive of malingering as well as serious adjustment disorder. (Id.) Although some of Plaintiff's responses were suggestive of severe psychopathology, the results of the Rorschach did not indicate any evidence of psychosis. (Id.) Dr. Marquis also found it significant that both orthopedic and mental health professionals could not explain how the 1996 accident could yield the degree of depression and severity of impairment of which Plaintiff complained. (R. at 288.) Dr. Marquis opined that Plaintiff might have an adjustment disorder with depressed mood and probably does have a diagnosable personality disorder on Axis II. (Id.) However, the record, other than Plaintiff's own complaints, did not support a finding of more than a mild to moderate impairment in her activities of daily living or in her social functioning. (Id.) She should be able to perform at least simple unskilled tasks. (Id.) Overall, Dr. Marquis could not find a psychiatric reason why she would not be able to return to gainful employment. (R. at 289.)

## III.  ALJ's Findings

The ALJ made the following specific findings (as taken verbatim from her March 31,

2000, decision):

> 1.    The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

> 2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

> 3.    The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

> 4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

> 5.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

> 6.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

> 7.    The claimant has the following residual functional capacity: simple, unskilled medium work.

> 8.    The claimant is unable to perform any of her past relevant work (20 CFR § 404.1545).

> 9.    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

> 10.    The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

11.     The claimant has no skills which are readily transferable to a
significant number of jobs within her residual functional capacity
(20 CFR § 404.1568).

12.     Considering the range of work at all levels which the claimant is
still functionally capable of performing, in combination with her age, education,
and work experience, and using section 203.29 of Table No. 3 the
Medical-Vocational Guidelines, the claimant is not disabled.

13.     The claimant was not under a "disability," as defined in the Social
Security Act, at any time through the date of this decision (20 CFR
§ 404.1520(f)).

## IV.  Discussion

In order to receive Disability Insurance Benefits, a claimant must suffer from a disability

within the meaning of the Social Security Act. An individual is disabled if she is unable "to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C.

§ 423(d)(1)(A). To meet this definition, an individual must have a severe impairment which

makes her unable to do her previous work or any other substantial gainful activity[2] which exists

in the national economy. 20 C.F.R. § 404.1505(a). The determination of a disability involves a

five-step process. *See* 20 C.F.R. § 404.1520; *Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir.

1994). The ALJ found in Plaintiff's favor at the first four steps, but found at step five that

Plaintiff was not disabled, because although she was severely impaired, she was able to perform

---

[2] Substantial gainful activity means work that involves doing significant and productive
physical or mental duties and is done for pay or profit. 20 C.F.R. § 404.1510.

other work within her residual functional capacity in the national economy. Plaintiff contests the ALJ's finding that she was not disabled.

Section 205(g) of the Social Security Act grants federal courts the authority to review final decisions of the Commissioner with the power to affirm, modify, or reverse, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). However, the scope of review this Court must use is quite limited; the Commissioner's decision must be affirmed so long as it is supported by substantial evidence.

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'" *Dray v. R.R. Ret. Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ's finding must be supported by more than a scintilla of evidence, but may be supported by less than the full weight of the evidence. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986). The reviewing court must consider all evidence on the record; however, it may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ, because the ALJ must resolve all factual issues and evidentiary conflicts. *Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir. 1993); *Delgado*, 782 F.2d at 82. Therefore, the critical question for this Court is not whether Plaintiff was disabled, but whether there is substantial evidence in the record to support the Commissioner's decision. If reasonable minds could disagree on whether Plaintiff is disabled, we must affirm the ALJ's decision denying benefits. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

Plaintiff argues that the ALJ made several errors in her determination that Plaintiff is not disabled. First, she argues that the ALJ committed legal error by failing to seek the testimony of

- 12 -

a vocational expert. Next she argues that the medical evidence does not support a finding that Plaintiff is able to perform unskilled medium work. She also argues that the ALJ erred by not providing a Mental Residual Functional Capacity Assessment. Plaintiff then argues that the ALJ erred in his credibility determination. Finally, she argues that the ALJ committed legal error by depriving Plaintiff the opportunity to cross-examine the author of adverse post-hearing evidence. Each of these arguments will be addressed in turn.

### A. The ALJ Did Not Err By Failing To Solicit Testimony From a Vocational Expert at the Hearing.

Plaintiff first argues that because she suffered from significant nonexertional impairments, the ALJ was required to solicit a vocational expert's testimony at the hearing to determine if a significant number of jobs existed in the national economy which Plaintiff can perform. She asserts that the ALJ's reliance on the Medical-Vocational Guidelines, or "grid," found at 20 C.F.R. Part 404, Subpart P, Appendix 2, to make the determination that Plaintiff was not disabled at step five was error.

An exertional limitation is an impairment-caused limitation which affects the claimant's capability to perform an exertional activity, i.e., one of the primary strength activities such as standing, sitting, walking, or lifting. SSR 83-10. A nonexertional impairment is any impairment which does not directly affect any of the exertional activities, and may include impairments which affect the mind, vision, hearing and speech. Id. Difficulty maintaining attention or concentrating is a nonexertional impairment. 20 C.F.R. § 416.969a(c)(1)(ii). Use of the grid is appropriate where the claimant suffers only from exertional limitations, and it provides a

framework for consideration of how much the individual's work capability is further diminished when the claimant suffers from both exertional and nonexertional limitations. SSR 85-15. An ALJ may find a vocational resource, such as a vocational expert's testimony, helpful or even necessary depending on the complexity of the case when a claimant suffers from both exertional and nonexertional limitations. SSR 83-14.

Plaintiff argues that the testimony of a vocational expert was required because the ALJ found that she had a functional limitation of deficiencies of concentration, persistence or pace, resulting in failure to complete tasks (in a work setting or elsewhere) in a timely manner. (R. at 30.) The ALJ rated Plaintiff's degree of limitation as "often," which was the middle of a five point scale from "never" to "constant" on the Psychiatric Review Technique Form. (Id.) The ALJ also found that Plaintiff suffered from mild depression and a mild personality disorder. (R. at 26, 29.) Relying upon *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996), in which the court found that the testimony of a vocational expert was necessary where the claimant "often" had deficiencies of concentration, persistence or pace, Plaintiff argues that her significant nonexertional impairments require the ALJ to consult a vocational expert.

"The use of the grid is inappropriate where the claimant's nonexertional impairments are so severe as to limit the range of work he can perform." *Herron*, 19 F.3d at 336. When the impairments reach this level of severity, "determination of disability is made through the 'testimony of vocational experts who can indicate what work, if any, the claimant is capable of performing.'" *Id.* at 336-37 (quoting *Nelson v. Sec'y of Health & Human Servs.*, 770 F.2d 682, 684 (7th Cir. 1985)). Whether an impairment is severe is a question of fact. *Clark v. Sullivan*, 901 F.2d 175, 178-79 (7th Cir. 1989).

The Court rejects Plaintiff's invitation to create a rule that any time a claimant is rated as "often" exhibiting deficiencies of concentration, persistence or pace, a vocational expert must be consulted. *See Myles v. Apfel*, No. 95 C 3929, 1998 WL 473940, at *4 (N.D. Ill. Aug. 3, 1998) ("the use of VEs is not mandatory in cases involving 'often' deficiencies of concentration"). This rule would go against the language and spirit of the regulations and the case law. It is only after the ALJ determines that the nonexertional impairments are sufficiently severe that a vocational expert must be consulted. The mere fact that Plaintiff suffers from a nonexertional impairment does not "immediately preclude utilization of the grid." *See Nelson*, 770 F.2d at 685. According to the regulations, if the issue in the disability determination is whether the claimant can use her work skills in other work and in which specific occupations the claimant may be employed, then the ALJ "will decide *whether* to use a vocational expert or other specialist." 20 C.F.R. § 404.1566(e) (emphasis added); SSR 83-14 (noting that use of a vocational resource "may be helpful" in obvious cases or "may be necessary" in more complex situations). *See also Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994) (claimant's nonexertional impairments of pain and hand restrictions were not sufficiently severe as to require the testimony of a VE); *Johnson v. Bowen*, 648 F. Supp. 443, 449 (N.D. Ill. 1986) (claimant's pain was not so severe as to restrict a full range of light work and use of the grid was not precluded); *Singleton v. Heckler*, No. 84 C 6490, 1989 WL 157999, at *4 (N.D. Ill. Dec. 13, 1989) (substantial evidence supported finding that claimant's nonexertional impairments of a nervous condition and pain were not so severe as to require the testimony of a VE).

Thus, the use of a VE is discretionary unless the claimant's nonexertional impairments are sufficiently severe. A finding that Plaintiff suffered from difficulty with concentration,

persistence or pace does not create a *per se* rule that a vocational expert must be consulted. *Newton* does not convince us otherwise. In *Newton*, an Eighth Circuit case, the claimant also suffered from deficiencies of concentration, persistence, or pace. 92 F.3d at 695. The Eighth Circuit held that the ALJ erred by failing to include these limitations in the hypothetical question to the VE because the VE could not be expected to remember all of the claimant's nonexertional limitations from the record alone. *Id.* Thus, *Newton* merely instructs that when a VE is called to testify, the VE must consider all of the claimant's impairments as found in the record in order to adequately give an opinion as to job availability. *But see Herron*, 19 F.3d at 337 (hypothetical question to the VE need not take into consideration every detail of the claimant's impairments especially where VE has reviewed the evidence).

The Court disagrees with Plaintiff's contention that the ALJ's finding that her nonexertional impairments were not severe was not supported by substantial evidence. The ALJ found that Plaintiff "often" suffered from deficiencies of concentration, persistence or pace, but did not find that she suffered from either of the next two highest and more serious ratings, "frequent" or "constant." (R. at 30.) The ALJ also found that Plaintiff had a "mild personality disorder" and "mild depression." (R. at 26, 29.) Neither of these are so severe as to require a VE's testimony. Dr. Altman determined that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual, but also noted that Plaintiff exhibited "questionable credibility" and might be "presenting herself as impaired for secondary gain." (R. at 211, 213.) After two examinations Dr. Long found that Plaintiff did not present a convincing case for depression or other mental illness, and opined that Plaintiff would be capable of performing simple repetitive tasks under supervision. (R. at 244, 281.) She had

the fair ability to remember and carry out complex job instructions but a good ability to understand, remember and carry out simple job instructions even though she had a poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (R. at 281.) Dr. Marquis concluded that the record did not support a finding of more than a mild to moderate impairment in her activities of daily living or social functioning. (R. at 288.) He could not find a psychiatric reason why Plaintiff would not be able to return to gainful employment. There is no evidence that Plaintiff's nonexertional limitations were sufficiently severe as to require the testimony of a VE, and the ALJ's decision is supported by substantial evidence.

Plaintiff also faults the ALJ's finding that she retained the RFC to perform "simple, unskilled medium work" because she claims that the use of the word "simple" further erodes the occupational base necessitating the testimony of a VE. We agree with Defendant that "simple" is a redundancy in that context that refers to "unskilled work." "Unskilled work," by its definition, "is work which needs little or no judgment to do *simple* duties that can be learned on the job in a short period of time." SSR 83-10 (emphasis added). Unskilled work usually can be learned in thirty days or less. 20 C.F.R. § 404.1568(a); SSR 83-10. We agree that "simple, unskilled" work does not indicate the presence of a limitation which would preclude application of the grid where the claimant is already limited to unskilled work and does not further limit the kinds of jobs that Plaintiff could perform. *See Jones v. Massanari*, No. 01 c 0024, 2001 WL 34382025, at *14 n.4 (W.D. Wisc. Oct. 18, 2001) (noting that "simple," "unskilled" and "no more than 3 or 4 instructions" appeared to be redundant).

## B. The Medical Evidence Supports the ALJ's Finding That Plaintiff Retains the RFC To Perform a Full Range of Unskilled Medium Work.

Plaintiff argues that the ALJ's finding that she retains the ability to perform simple, unskilled medium work was not supported by substantial evidence. She complains at length that the ALJ overlooked key evidence of her physical and mental limitations, failed to reconcile inconsistent evidence, failed to seek additional evidence, and selectively chose to discuss only that evidence which supported her ultimate conclusion. To the contrary, we find that the ALJ's decision does contain, and her ultimate determination is based upon, all of the relevant evidence in the record. *See Garfield v. Schweiker*, 732 F.2d 605, 609-10 (7th Cir. 1984).

Plaintiff first finds fault with the ALJ for not mentioning that Dr. Rabinowitz diagnosed Plaintiff with chronic lumbar myofacial pain syndrome after his July 1998 consultative examination. As Plaintiff recognizes, however, the ALJ does summarize the findings of this consultative exam in great detail even though she did not write out the actual diagnosis in her decision. (R. at 19.) Plaintiff also claims that the ALJ did not take records submitted from the St. James Orthopedic & Occupational Rehabilitation Center indicating that Plaintiff suffered from chronic myofascial pain into account, even though the ALJ noted that Plaintiff did receive physical therapy in 1998. (R. at 19.) Myofacial pain syndrome is a "nonarticular disorder characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures." (Pl.'s Mem. at 12, citing *The Merck Manual*, 481 (17ed. 1999)). We agree with Defendant that this diagnosis is not contrary to the ALJ's decision, and the ALJ did not improperly disregard the evidence underlying this diagnosis. The ALJ found that Plaintiff has severe impairments due to a back impairment, mild depression, and a personality

- 18 -

disorder. (R. at 18.) Additionally, the diagnosis reflects Plaintiff's subjective complaints of low back pain, which the ALJ took into consideration. (E.g., Id.) With respect to the physical therapy records, the ALJ noted that Plaintiff had received physical therapy, but not any aggressive treatment. (R. at 18.) The ALJ considered these lines of evidence, as she is required to do, but she is not required to discuss every piece of evidence in writing, as long as the reviewing court is able to trace the path of her reasoning. *See Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995).

Next, Plaintiff faults the ALJ for not discussing three separate RFC's completed by non-treating, non-examining physicians. (Plf.'s Br. at 13-14.) The first RFC (August 4, 1998) found that Plaintiff may "occasionally" lift and/or carry up to 20 pounds and "frequently" lift and/or carry 10 pounds which is consistent with light work.[3] (R. at 186.) The physician noted that Plaintiff's allegations were consistent with the medical evidence. (R. at 190.) The second RFC completed on January 28, 1999, found that Plaintiff may "occasionally" lift and/or carry up to 50 pounds, and "frequently" lift and/or carry 25 pounds which is consistent with medium work.[4] (R. at 221.) Completed on May 7, 1999, the third RFC found that Plaintiff had no exertional limitations (i.e., no limitations on her ability to lift and carry, stand and walk, and sit), but should only occasionally climb and stoop. (R. at 229-30.) Plaintiff claims that the ALJ had a duty to resolve the inconsistencies between these three RFC determinations, possibly by

---

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b).

[4] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c). A claimant who is able to perform medium work is also deemed able to perform light and sedentary work. Id.

discussing the qualifications of the consultants. The reviewing physicians, however, are highly qualified, and their respective qualifications is only one of the many factors that may be used to determine the weight to which an opinion is entitled. SSR 96-6p. The opinions can only be given weight insofar as they are supported by the medical evidence in the record. *See* SSR 96-6p. In this case, the second RFC assessment supports the ALJ's finding that Plaintiff can perform medium work, and the third RFC does not help Plaintiff's case in the slightest because it finds that she has no exertional limitations. Even the first RFC determination concludes that Plaintiff retains the residual functional capacity to perform light work. Defendant points out, and Plaintiff does not dispute, that if Plaintiff were capable of performing only light work, the ALJ could have properly applied grid rule 202.20, which would also have supported a finding that Plaintiff was not disabled. *See Diaz*, 55 F.3d at 30 (finding that claimant's ability to do sedentary work was supported by substantial evidence and required a finding of not disabled). As is made clear by SSR 96-6p, the ALJ must look to the medical evidence as a whole, which we have determined that she did. Thus, the ALJ's apparent failure to reconcile these three RFC's (which do not even support Plaintiff's claim that she is disabled) does not mean that the ultimate RFC determination was not based on substantial evidence.

Plaintiff then argues that the ALJ's finding that there was "minimal" evidence to support the severity of Plaintiff's back impairments obligated the ALJ to re-contact Plaintiff's treating physicians to seek additional evidence or clarification and to order Plaintiff to undergo another consultative exam. Plaintiff overstates what is required by the regulations.[5] Plaintiff must

---

[5]  While Plaintiff was granted leave to file a brief in excess of fifteen pages, several of her arguments could have been made more concisely or not at all.

provide medical evidence demonstrating that she has an impairment and its severity. *See* 20 C.F.R. § 404.1512. If the evidence is inadequate to determine whether she is disabled, the government must seek additional information. 20 C.F.R. § 404.1512(c). This information will be sought when the report from the treating physician contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or is not based on medically acceptable diagnostic technique. 20 C.F.R. § 404.1512(e)(1). A consultative exam may be ordered if the information needed is not readily available from the medical sources, but this will only be ordered after a reasonable effort to obtain information from the treating source fails. 20 C.F.R. § 404.1512(f). Thus, the ALJ was only required to recontact Plaintiff's treating physician[6] if there was a conflict or ambiguity that needed to be resolved, or if the reports did not contain all the necessary information. Plaintiff does not point to any conflicts or ambiguities that needed to be resolved, or identify what information is missing. The ALJ was not required to contact Plaintiff's physicians or to order a consultative exam just because there simply is no underlying medical evidence available to support her complaints.

Plaintiff also argues that the ALJ's failure to summarize the testimony of Plaintiff's friend and caretaker, Ms. Jennings, reflected the ALJ's disregard of significant evidence contrary to her ruling. Ms. Jennings's testimony mirrored Plaintiff's testimony and supported Plaintiff's claims of pain. Briefly, we note that the ALJ is not required to discuss specific reasons for rejecting Plaintiff's friend's testimony because the issues raised by Ms. Jennings were discussed when the ALJ discussed Plaintiff's testimony. *See Herron*, 19 F.3d at 337 (ALJ did not err in failing to

---

[6] Defendant points out that determining who Plaintiff's treating physician is would be difficult as her medical visits were few and far between.

discuss reasons for rejecting claimant's wife's testimony because the ALJ discussed the issues raised by the wife's testimony in the decision). Furthermore, there is no reason to think that the ALJ would have come to a different conclusion had she mentioned Ms. Jennings's testimony because it is clear that the ALJ properly rejected Plaintiff's claims of debilitating pain, as will be discussed below.

Plaintiff then turns her attention to the ALJ's assessment of Plaintiff's mental impairments. (Plf.'s Br. at 15-17.) Plaintiff complains that the ALJ failed to resolve an inconsistency in Dr. Long's mental RFC assessment, namely, that the MRFC assessment found that Plaintiff had a poor or no ability in virtually all occupational areas assessed, (R. at 282), while Dr. Long's narrative report concluded that Plaintiff could perform simple repetitive tasks under supervision, (R. at 281). First, as the ALJ correctly noted, the MRFC form clearly reflected Plaintiff's subjective complaints about her inability to perform occupational adjustments. (R. at 282.) Dr. Long's narrative report, on the other hand, notes his inability to find a medical basis for Plaintiff's complaints, states that she does not clearly present as having a severe mental illness, and concludes that she can perform simple repetitive tasks. (R. at 281.) The fact that Plaintiff's complaints do not coincide with Dr. Long's assessment of her abilities does not mean that the report is internally inconsistent. Rather, it indicates that Dr. Long evaluated the extensive evidence in front of him, including the psychological tests that were performed, and came to his own conclusion about the extent of Plaintiff's limitations. Next, Plaintiff has again overstated the regulations. Under the regulations, the ALJ is required to review the report of the consultative examination to determine whether it furnishes the requested information. 20 C.F.R. § 404.1519p(a). One of the various factors to be considered in reviewing

the report is whether the report is internally consistent. 20 C.F.R. § 404.1519p(a)(2). Only if the report is inadequate or incomplete must the ALJ recontact the consulting examiner. 20 C.F.R. § 404.1519(p)(b). The ALJ in this case properly reviewed Dr. Long's report and separated out information based on Plaintiff's subjective complaints as opposed to Dr. Long's opinion, determined what weight it should be given, and explained her reasoning in her opinion. We find no error on this point.

Finally, Plaintiff argues that the ALJ's failure to discuss Dr. Altman's report of January 16, 1999, violates 20 C.F.R. § 404.1519p and SSR 96-6p. Dr. Altman found that Plaintiff exhibited major depression with psychosis and a pain disorder, but when rating Plaintiff's impairment severity on the PRTF, found only moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and only seldom deficiencies of concentration, persistence or pace. (R. at 205, 209.) Dr. Altman's mental RFC assessment form reports that Plaintiff was only moderately limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance. (R. at 211.) She was not limited in any other area dealing with sustained concentration and persistence. (Id.) Dr. Altman also noted that Plaintiff exhibited "questionable credibility" and found that she was capable of substantial gainful activity. (R. at 213.) We do not find either of these two forms to be internally inconsistent, and do not find the reports (which analyze different questions as Plaintiff acknowledges on page 5 of her reply brief) to be so inconsistent with each other as to require a revised report under 20 C.F.R. § 404.1519p(b). Dr. Altman found that Plaintiff was impaired, but when determining the severity of her impairments, found on both reports that she was only moderately impaired in certain limited areas. This is not inconsistent with her finding

on the mental RFC form that Plaintiff could engage in substantial gainful activity, as she was not severely or markedly impaired in any way and was only moderately limited in but a few categories. We also note that although the ALJ did not explicitly discuss Dr. Altman's findings, she did rely upon the opinion of Dr. Marquis which did refer to Dr. Altman's finding that Plaintiff was psychiatrically capable of significant gainful activity. In any event, these evaluations did not favor Plaintiff and the ALJ's failure to mention them does not mean that her opinion was not supported by the substantial weight of the evidence.

### C.    The ALJ's RFC Assessment Encompasses an Assessment of Plaintiff's Mental RFC.

Plaintiff's next area of argument relates to her mental impairment. She argues that the ALJ was required to complete a mental RFC that satisfies the requirements of 20 C.F.R. § 404.1520a, and that the ALJ's narrative assessment of Plaintiff's RFC does not satisfy these requirements. Plaintiff suggests that the ALJ should have completed the standard mental RFC form to meet these requirements.

The special technique that is used to evaluate the severity of mental impairments for adults is described in 20 C.F.R. § 404.1520a. Under this technique, the ALJ must first determine if the claimant suffers from a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Once the presence of a mental impairment is confirmed, the ALJ will then rate the degree of functional limitation resulting from the impairment. 20 C.F.R. § 404.1520a(d). After the degree of functional limitation is rated, the ALJ will then determine the severity of the mental impairment, and whether it meets or is equivalent to a listed mental disorder. 20 C.F.R.

§ 404.1520a(d). The Summary Review Report, which was completed by the ALJ, meets these requirements as does the ALJ's narrative discussion at pages 18-19.[7] (R. at 24-31.) Plaintiff does not argue otherwise. After performing these steps, the ALJ concluded that Plaintiff has a severe mental impairment but her impairment did not meet or equal any of the listings. (R. at 24.) She found that an RFC assessment was necessary. (Id.) This comports with 20 C.F.R. § 404.1520a(d)(3), which requires an assessment of residual functional capacity if the claimant suffers from a severe non-listing level impairment. 20 C.F.R. § 404.1520a(d)(3) ("If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.") Plaintiff faults the ALJ's assessment of her mental RFC.

Residual functional capacity is the most the claimant can still do despite her mental and physical limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. When assessing the claimant's mental abilities, the ALJ will "first assess the nature and extent of [her] mental limitations and restrictions and then determine [her] residual functional capacity for work activity on a regular

---

[7] The ALJ's assessment of the severity of the claimant's impairment and the residual functional capacity assessment may be set forth in the ALJ's decision. 20 C.F.R. § 404.1520a(e). Plaintiff acknowledges that "a specific form is not required," but then argues that the standard Mental Residual Functional Capacity Assessment form would satisfy the requirements of this regulation whereas a mere narrative assessment does not satisfy the requirements. (Plf.'s Resp. at 4-5.) Plaintiff cites to *Walton v. Chater*, No. 94 C 1484, 1995 WL 579535, at *12 (N.D. Ill. 1995), in which the court found that the ALJ was required to complete the standard mental RFC assessment form and append it to his opinion. That opinion, however, interpreted an analogous earlier version of the regulations covering applications for SSI, which stated that in "all cases involving mental disorders at the administrative law judge hearing . . . the standard document will be appended to the decision." *Id.* (citing 20 C.F.R. § 416.920a(d)). The current regulations state that while the standard document must be completed at the initial and reconsideration levels of the administrative review process, the applications of the technique may be documented within the decision at the administrative law judge hearing level. 20 C.F.R. § 404.1520a(e).

and continuing basis." 20 C.F.R. § 404.1545(c). Much of the information and evidence that is used to determine whether a claimant's impairment meets or equals a listing is also used to determine the mental RFC. SSR 85-16 ("in determining the impact of a mental disorder on an individual's capacities, essentially the same impairment-related medical and nonmedical information is considered to determine whether the mental disorder meets listing severity as is considered to determine whether the mental impairment is of lesser severity, yet diminishes the individual's RFC"); SSR 96-8p (the PRT form summarizes various functions that must be evaluated in a more detailed assessment to determine mental RFC). The determination of mental RFC, however, focuses on the claimant's work-related abilities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 ("RFC is a multidimensional description of the work-related abilities you retain in spite of your medical impairments"). The RFC assessment, therefore, complements the listings evaluation by requiring consideration of an expanded list of work-related capacities. *Id.* The capacities evaluated include "the ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting." SSR 85-16 (citing 20 C.F.R. § 404.1545(c)). Evidence to be considered includes the history, findings and observations from medical sources and reports of activities of daily living and work activity. *Id.*

When determining Plaintiff's RFC, the ALJ separately considered her mental and physical impairments. As noted by the regulations, parts of the assessment of whether Plaintiff's impairments met any listing level impairment coincide with the mental RFC assessment. In this regard, the ALJ noted that Plaintiff only exhibited slight restrictions in the activities of daily living as she can care for her personal needs, drive, and perform light household chores. (R. at

18, 30.) Plaintiff had only slight difficulties in maintaining social functioning, as exhibited by her interaction with her friend and outings that they took together. (Id.) While Plaintiff exhibited deficiencies of concentration, persistence and pace, test results also revealed that she was able to repeat five digits forward and four digits in reverse, and perform serial sevens which demonstrated her concentration abilities and memory. (Id.); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 ("concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100 [or] through tasks requiring short-term memory").

After discussing Plaintiff's physical limitations that affected her ability to perform work-related activities, the ALJ discussed Plaintiff's mental limitations as they impacted her ability to perform work-related tasks. (R. at 19.) The ALJ determined that the opinions of Dr. Marquis and Dr. Long should be given great weight, while the consultative examination by Dr. Rodos was not valid. (R. at 19-20.) The ALJ detailed the tests performed by Dr. Long, which revealed that Plaintiff exhibited an ability to concentrate, exaggerated her symptoms, demonstrated an adequate grip on reality, and exhibited extreme impulsivity and dependancy. *See* SSR 85-16 (ALJ bears responsibility to "identify the pertinent evidence from medical and nonmedical reports" and to determine the RFC). Drs. Long and Marquis both agreed that Plaintiff retained the residual functional capacity to perform simple unskilled tasks. The ALJ's determination that Plaintiff can perform simple unskilled work is consistent with these findings. Her assessment satisfies the requirements of 20 C.F.R. § 1520a(d)(3) and SSR 85-16 and is supported by the substantial evidence in the record.

### D. The ALJ's Credibility Determination Was Not Patently Wrong.

Plaintiff next attacks the ALJ's finding that Plaintiff was not entirely credible on several fronts regarding her restrictions of daily activities. She argues that she can be disabled even if she engages in limited general life activities. She also argues that the ALJ placed too much emphasis on her failure to seek medical attention, her use of medication, and the reports that suggested malingering. Furthermore, she argues that the ALJ did not place great enough weight on the testimony of Plaintiff's caretaker. Finally, she argues that certain words used in the ALJ's opinion demonstrate the ALJ's bias against her.

The ALJ is in the best position to see and hear the witnesses, and therefore her credibility determination is afforded special deference. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The credibility determination should only be reversed if Plaintiff can show it was "patently wrong." *See id.* (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)). However, if the determination rested "on objective factors or fundamental implausibilities rather than subjective considerations," the Court has greater freedom to review the ALJ's decision. *See Herron*, 19 F.3d at 335.

Plaintiff's argument that she may be disabled even if she can perform limited daily activities is unavailing. The disability determination is a five step process that should rely on the totality of the evidence in the record and it does not hinge on whether or not the claimant can perform daily activities. 20 C.F.R. § 404.1520; *Herron*, 19 F.3d at 333 n.8. At no time did the ALJ determine that merely because Plaintiff only experienced slight limitations in the activities of daily living that she automatically was not disabled. Rather, this was only one of many factors that she took into consideration in the final disability determination.

The ALJ first looked at Plaintiff's daily activities while performing the Psychiatric Review Technique to determine whether Plaintiff suffered from a listing level impairment. (R. at 18.) After determining that Plaintiff suffered from mild depression and a personality disorder (Part A), the ALJ turned to the criteria in paragraph B to determine if she exhibited the impairment-related functional limitations that would be incompatible with the ability to do any gainful activity. One of the four paragraph B criteria is "marked restriction of activities of daily living." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.08. The ALJ found that Plaintiff only exhibited slight restrictions of activities of daily living, slight difficulties in maintaining social functioning, often deficiencies of concentration, persistence or pace, and no episodes of deterioration or decompensation in work settings. (R. at 18, 30.) We note that even if the ALJ had found that Plaintiff were more restricted in activities of daily living, she still would not meet another B paragraph criterion that would mandate a finding that she met or equaled a listing level impairment.

Next, the ALJ again mentioned Plaintiff's daily activities while evaluating the credibility of Plaintiff's subjective complaints while performing the RFC assessment. In addition to finding that Plaintiff only suffers from slight restriction of daily activities, the ALJ also determined, based on the factors found in SSR 96-7p, that Plaintiff was not credible. *See also* 20 C.F.R. § 404.1529(c)(3) (listing same factors). The factors include daily activities; the location, duration, frequency, and intensity of the individual's pain; factors that precipitate and aggravate the symptoms; the type, dosage and effectiveness of any medications; other treatment besides medication; and any measures besides treatment used to alleviate the pain. SSR 96-7p.

At the hearing, Plaintiff testified that she did not cook, clean, or do anything around the house except watch TV. (R. at 38-39, 54-55.) She did not leave except occasionally to go to the mall or a church function with her caretaker. (R. at 40.) She had tried working at several jobs, but could not work for more than one day "because I couldn't stand the pain." (R. at 45.) Nevertheless, as noted by the ALJ, (R. at 18), Plaintiff reported to Dr. Rabinowitz that she drove to a limited extent, did light household chores, and was able to perform routine activities of daily living, (R. at 181). She had driven to a consultative exam in December 1998 and reported on application forms that she occasionally drove. (R. at 115, 140, 197.) Her testimony and that of Ms. Jennings revealed that she visited with Ms. Jennings on a daily basis and was able to take outings such as to the mall and to the movies. The record revealed that Plaintiff worked after the accident and had earned $4,005 in 1997, and $6,739 in 1998. (R. at 17.) The ALJ also noted that Plaintiff told Dr. Long she was hospitalized for two weeks after the accident which had rendered her unconscious, but the hospital records revealed she was released the same day and never reported a loss of consciousness. (R. at 21.) She also noted that Plaintiff twice misrepresented the amount of money she was earning while employed by DCFS. (Id.) The inconsistency between Plaintiff's testimony, her prior reports and statements, and the evidence in the record provides support for the ALJ's finding that Plaintiff was only slightly limited in her activities of daily living and her testimony to the contrary was not credible. *See Powers*, 207 F.3d at 435 (noting that while the many interviews and forms required to apply for benefits should not function as traps for the unwary, discrepancies in a claimant's record and testimony may provide support for a finding of incredibility).

Plaintiff also argues that the ALJ should not have considered her failure to seek medical attention and her use of over-the-counter medication in her credibility determination because Plaintiff gave a legitimate reason, lack of insurance and money, as to her failure to seek treatment. Under the regulations and rulings, however, the treatment received by the claimant, as well as the type and effectiveness of the medication that are taken should be considered by the ALJ. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. Therefore, because the ALJ did not err in considering this information, Plaintiff must be arguing that the ALJ came to the wrong conclusion regarding Plaintiff's credibility based on this evidence. However, the ALJ noted that Plaintiff had failed to seek medical treatment even immediately following the accident. (R. at 19.) She also noted that the treatment was not successful, apparently due to a lack of effort on Plaintiff's part. Specifically, Dr. Trafimow prescribed a series of vigorous back stretching exercises, but when Plaintiff returned to his office a month later, she had not improved and was told that she must be willing to do more. (Id.) It was not until one year later that Plaintiff sought treatment again even though she appeared to have been insured for some time after the accident. (R. at 253.) Upon examination by Dr. Trafimow she displayed a voluntary weakness of the extensor hallucis longus. She was encouraged to attempt to strengthen, but did not comply. She also displayed virtually all of Waddell's signs. (R. at 19.) While mere remissness would not be conclusive as to a credibility finding, in this case, non-compliance with prescribed treatment and the type and frequency of medical treatment sought by Plaintiff lends support the ALJ's credibility determination.

Likewise, the ALJ properly considered Plaintiff's use of pain medication. *See Powers,* 207 F.3d at 435-36 (noting that the plaintiff's prescription medication was not intended to treat

severe pain and did not support her complaints of severe pain); 20 C.F.R. § 404.1529(c)(iv).

First, as correctly noted by the ALJ, for much of the record Plaintiff primarily used over-the-counter pain medication to treat her back pain. Next, she also testified at the hearing that she had taken Naprelan samples the morning of the hearing.[8] (R. at 61.) Naprelan is a nonsteroidal anti-inflammatory drug with analgesic properties. Physician's Desk Reference (2004) at 1227. It is used to treat rheumatoid arthritis, osteoarthritis, and bursitis. It is also used to treat mild to moderate pain. Id. at 1228. Plaintiff testified that after the accident, the Naprosyn (Naprelan) would "knock [the pain] out." (R. at 52.) Thus, even the pain medication given to Plaintiff by her physician does not support her complaints of severe pain. As noted in *Powers*, the "discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition. For the hearing officer to rely on this as evidence of a lack of complete candor cannot be deemed patently wrong." 207 F.3d at 435-36.

Plaintiff also finds fault with the ALJ's notation that "malingering has been suggested on numerous occasions" when assessing Plaintiff's credibility. (R. at 21.) Plaintiff points out that malingering, the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives (such as avoiding work), is different from factitious disorder, which also involves the intentional production of physical or psychological signs or symptoms, but without the external incentives for the behavior. DSM IV (1994) at 471-73, 683.

---

[8]  Plaintiff also testified that she took samples of Arthrotec, (R. at 61), which is used for treatment of the signs and symptoms of osteoarthritis or rheumatoid arthritis in patients who cannot take other non-steroidal anti-inflammatory drugs due to the risk of stomach ulcers. Physician's Desk Reference (2004) at 3013-14.

Dr. Long diagnosed Plaintiff as appearing to have Factitious Disorder with Combined Psychological and Physical Signs and Symptoms. (R. at 280.) He also noted that the results of the MMPI-II were "invalid and suggest[ed] malingering." (R. at 278.) The results indicated nothing more than her level of distress at that point in time, or her efforts to express her feelings in the most dramatic and negative manner. (R. at 279.) Dr. Long concluded that she did not clearly present as having a severe mental illness and could perform simple repetitive tasks under supervision. (R. at 281.) In an earlier evaluation, Dr. Long noted that Plaintiff's expressions of depression on the Beck Depression Inventory-II did not seem consistent with her overall situation. (R. at 244.) He concluded that she "is obviously seeking assistance and seems to endorse all items during the mental status exam and other administered tests that would lead to a conclusion that she is incapable of working." (Id.) He recommended that the MMPI-II and Rorschach test be given to Plaintiff. (Id.)

Dr. Marquis reviewed the additional tests performed by Dr. Long, and found it significant that the results of the MMPI-II were invalid and suggestive of malingering. (R. at 287.) He also noted that Plaintiff endorsed items that were suggestive of severe psychopathology, but other evidence did not support the severity of such an illness. (Id.) In addition to Dr. Long's suggestion of malingering, Dr. Altman noted that Plaintiff "seems to be presenting herself as impaired for secondary gain." (R. at 213.) Although the ALJ did not rely upon this report in her credibility findings, and the Court does not normally rely upon arguments not set forth by the ALJ, in this case, the Court takes notice of Dr. Altman's report as contradicting Plaintiff's bald assertion that the "only time malingering has been suggested is in the post-hearing evidence submitted by Dr. Long and reiterated by Dr. Marquis . . . ." (Plf.'s Mem. at 20.) The suggestion

that Plaintiff is malingering is only one of several factors that the ALJ properly took into account in assessing Plaintiff's credibility. The Court notes additionally that the pain a claimant feels can have psychological as well as physical causes and the ALJ cannot discount the claimant's complaints of pain merely because they have psychological origins. *See cf. Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (noting that the fact that pain may have a purely psychological source does not disentitle the applicant to benefits). Here, the ALJ did not completely discount Plaintiff's complaints of pain, rather she noted that Plaintiff suffered from a severe impairment due to her back and mental problems. The ALJ was still obligated, as she did, to assess Plaintiff's subjective complaints of pain, regardless of the physical or psychological source of her pain. The credibility question remains, and must be answered in order to determine the severity of her impairments, and whether they so severe that Plaintiff is not able to work.

As a final note, we find that the ALJ's credibility determination did not show a personal bias or lack of neutrality. Her word choices that Plaintiff did not "bother" to seek medical attention and for a substantial amount of time "only" took over-the-counter medication indicate a proper evaluation of the evidence pursuant to SSR 96-7p and do not reflect her "personal value judgments" as argued by Plaintiff. Additionally, the ALJ's use of the word "alleged" when referring to Plaintiff's mental impairments, (R. at 21), is inconsequential, given that she found that Plaintiff had severe impairments due to her mild depression and a personality disorder, (R. at 18). Finally, Plaintiff argues that the ALJ did not place great enough weight on the corroborating testimony of Plaintiff's caretaker. However, it is not for the Court to reweigh the evidence or substitute our judgment for that of the ALJ. *See Jones*, 10 F.3d at 523. Ms. Jennings's testimony merely reflected Plaintiff's subjective complaints of pain and the ALJ was not required to

- 34 -

separately discuss specific reasons for rejecting her testimony because the issues raised by Ms. Jennings were discussed when the ALJ discussed Plaintiff's testimony. *See Herron*, 19 F.3d at 337 (ALJ did not err in failing to mention reasons for rejecting claimant's wife's testimony because ALJ discussed the issues raised by the wife's testimony in the decision). The ALJ's finding that Plaintiff was not credible and that her mental impairments only resulted in slight restrictions of activities of daily living is supported by the substantial weight of the evidence.

### E. The ALJ's Treatment of the Post-Hearing Evidence Did Not Deprive Plaintiff of Her Due Process Rights.

Plaintiff's final argument stems from the submission of post-hearing evidence. After the hearing, at Plaintiff's attorney's request, the ALJ sent Plaintiff to Dr. Long for Rorschach and MMPI-II tests. (R. at 79.) The results were reviewed by Dr. Marquis, who concluded that there was no psychiatric reason why Plaintiff could not return to some type of gainful employment. (R. at 289.) Plaintiff's attorney reviewed the additional evidence and wrote a letter to the ALJ arguing that the evidence further supported a finding that Plaintiff had met her burden of showing she cannot perform past work. (R. at 290.) Plaintiff now argues that her due process rights were violated because she did not know that the ALJ would interpret the post-hearing evidence against her, and she was not given the opportunity to request a supplemental hearing to cross-examine the author of the evidence. The record indicates, however, that Plaintiff was given a meaningful opportunity to respond to and rebut the additional evidence, that she waived any further right to do so, and therefore her due process rights were not violated.

Under 42 U.S.C. § 405(b)(1), when a hearing is held, the disability determination must be made "on the basis of evidence adduced at the hearing." *See also Lonzollo v. Weinberger*, 534 F.2d 712, 714 (7th Cir. 1976) (noting same in context of Appeals Council). Post-hearing evidence is therefore afforded special treatment to ensure that the claimant is given the opportunity to respond, rebut, and request cross-examination. The Hearings, Appeals and Litigation Law Manual (HALLEX) indicates that proffer of posthearing evidence is required unless the claimant has knowingly waived her right to examine the evidence or the ALJ proposes to issue a fully favorable decision. HALLEX I-2-7-30.[9] The proffer letter must give the claimant a deadline to respond to the evidence and to request a supplemental hearing and the opportunity to cross-examine the author of the evidence. Id. Where the ALJ enters medical reports into the record, the claimant should also be informed of her right to submit the new evidence to a treating source and submit any comments from the treating source to the ALJ. Id. *See also* I-2-7-91 (providing sample of a letter to a claimant's representative enclosing a copy of new evidence).

We first note that HALLEX does not carry the authority of law. The purpose of HALLEX is to set forth guidelines and internal procedures for the Office of Hearings and Appeals staff. HALLEX I-1-0-1; *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (noting that HALLEX is not binding where it does not reflect an underlying regulation); *Blevins-Moore v.*

---

[9] We find that although the form proffer letter suggested by HALLEX is not a part of the record, the evidence was in effect proffered to Plaintiff's counsel because it was provided to him and he appeared to have responded within a reasonable time frame. *See Oyen v. Shalala*, 865 F. Supp. 497, 509 n.16 (N.D. Ill. 1994) (noting that "proffer" of post-hearing evidence can be inferred from circumstances). Thus, we find that section I-2-7-15 relied upon by Plaintiff is inapplicable. Section I-2-7-15 applies where the claimant has waived the right, on the record or in writing, to examine post-hearing evidence. Plaintiff did not waive her right to review the evidence, and therefore the ALJ proffered the evidence to her attorney.

*Barnhart*, 2003 WL 21919191, at *3 (N.D. Ind. July 30, 2003) (finding that Federal Regulations control over HALLEX); *but see Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (finding that administrative agencies should follow their own internal procedures where the rights of individuals are affected but also finding the result may stand unless there is prejudice to the claimant). However, Plaintiff must be given the opportunity to respond to post-hearing evidence and request a supplemental hearing to ensure that the requirements of 42 U.S.C. § 405(b) are met. Therefore, the question remains, that if Plaintiff's attorney was not provided with the standard suggested proffer letter, were Plaintiff's due process rights violated.

In the 1976 Seventh Circuit case of *Lonzollo*, the court held that where post-hearing evidence is received and subsequently reviewed by the claimant, the claimant may waive the right to rebut and cross-examine if "the waiver is clearly expressed or strongly implied from the circumstances." 534 F.2d at 714. In *Lonzollo*, waiver was not found, but the facts are distinguishable from the instant case. In *Lonzollo*, the Appeals Council, *sua sponte*, reviewed and reversed an ALJ's decision, relying upon evidence that was not presented at the hearing in front of the ALJ. *Id.* at 713. The Appeals Council initially informed the claimant, who resided in Chicago, that it required additional medical evidence and informed him that he could provide further evidence or a statement and also gave him the opportunity to attend a hearing in Virginia in front of the Council. The claimant submitted to the requested medical examination. The Appeals Council then provided the results of the medical exam to the claimant, along with a letter informing him that it intended to include the evidence in the record of the case, and gave him the "opportunity to comment upon it if you wish." *Id.* at 714. The claimant, representing himself, responded to the medical report, disputing parts of it that did not favor him. The

- 37 -

Appeals Council subsequently reversed the ALJ's decision in favor of the claimant, relying on the post-hearing evidence.

The court found that a waiver of his right to appear at a hearing and cross-examine could not be implied from those particular circumstances. The claimant did not waive his right to appear at the hearing by failing to appear in Virginia because it was clear that his financial circumstances prevented him from doing so. *Id.* The court found it significant that the ALJ, who had seen and heard the claimant, had found his complaints to be genuine and found him disabled. The court noted that the supplementary evidence could have been heard in Chicago, in front of an ALJ, in order to afford the claimant the opportunity to appear. *Id.* at 715. In those circumstances, "the opportunity to submit material or comments in writing did not fulfill [claimant's] right to a decision based on 'evidence adduced at the hearing.'" *Id.*; *see also Oyen v. Shalala*, 865 F. Supp. 497, 510 (N.D. Ill. 1994) (finding that *pro se* claimant was deprived right to cross-examine the author of adverse post-hearing evidence when not informed of this right pursuant to HALLEX I-2-730).

In this case at hand, we first note that Plaintiff was represented by counsel at the hearing in front of the ALJ and by the same attorney when the post-hearing evidence was received, unlike the plaintiffs in *Lonzollo* and *Oyen*. The rights of *pro se* claimants are of course no different than those of claimants who are represented by counsel, but at times special assistance is given to ensure that *pro se* litigants are aware of their rights. *E.g., cf.* HALLEX I-2-7-35 B (when post-hearing evidence is not proffered "the ALJ must ensure on-the-record that the claimant (especially a *pro se* claimant) is fully informed" of the effects of waiver). We also note that there was no indication that the ALJ was going to rule in favor of Plaintiff, or any indication that she

- 38 -

had found Plaintiff's complaints of debilitating pain to be particularly credible due to her testimony, unlike in *Lonzollo*. Furthermore, also unlike *Lonzollo*, the possibility of a supplemental hearing in front of an ALJ in Chicago was available to Plaintiff, had she chosen to request it. Instead, her attorney reviewed the reports of Drs. Long and Marquis, and responded to the new evidence in a written letter to the ALJ. (R. at 290-91.)

The letter from Plaintiff's attorney recognizes that Dr. Marquis concluded that Plaintiff could perform some type of gainful employment, but responded to this conclusion on several fronts. First, it points out that Dr. Long only recommended "simple repetitive tasks under supervision" for Plaintiff. (R. at 290.) Dr. Long also found that Plaintiff is only poorly able to behave in an emotionally stable manner and is unreliable. The letter suggests that Plaintiff may need closer than normal supervision, based on the conclusion of Dr. Marquis that Plaintiff requires supervision. (Id.) The mental RFC completed by Dr. Long, which was properly disregarded by the ALJ as discussed above, is also referenced by the letter. (Id.) The letter discusses the Factitious Disorder diagnosis, and contrasts it to malingering. (Id.) In conclusion, the letter states that "the evidence herein clearly supports a finding that claimant has met her burden of showing that she cannot perform her past work or any other work . . . ." (R. at 291.) Plaintiff requests a favorable decision "at your earliest convenience." (Id.)

The letter indicates that the evidence was reviewed throughly, and from the circumstances it is apparent that Plaintiff waived her right to request a supplemental hearing and the opportunity to cross-examine. Plaintiff appears to be arguing that if she knew the ALJ was going to disregard Dr. Long's mental RFC, she would have challenged the ALJ's perception that the report contained evidence adverse to her. However, it is apparent that the letter addressed the negative aspects of

the reports, provided counter-arguments and pointed to supporting evidence in the record, and requested no further right to rebut the evidence. In fact, it requests a decision as soon as possible. We find her argument that she did not know the ALJ might interpret the reports against her to be unpersuasive. *See also Schmidt v. Callahan*, 995 F. Supp. 869, 881-82 (N.D. Ill. 1998) (waiver of right to request subpoena and cross-examine can be inferred depending on circumstances), *aff'd Schmidt*, 201 F.3d at 973. Plaintiff's rights were not violated by the ALJ's apparent failure to inform her attorney that she had the right to rebut the evidence or require a supplemental hearing.

### V.    Conclusion

For the above reasons, the Court affirms the Commissioner's final decision. The Commissioner's motion for summary judgment is therefore granted, and Plaintiff's motion for summary judgment is denied.

### ENTER ORDER:

**MARTIN C. ASHMAN**
**Dated:** June 28, 2004.                    United States Magistrate Judge

- 40 -

Copies have been mailed to:

MARK D. DeBOFSKY, Esq.                    MR. EDWARD J. KRISTOF
Daley, DeBofsky & Bryant                  Special Assistant United States Attorney
One North LaSalle Street                  200 West Adams Street
Suite 3800                                30th Floor
Chicago, IL  60602                        Chicago, IL  60606

Attorney for Plaintiff                    Attorney for Defendant